**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Center for Biological Diversity, | No. CV-22-00138-TUC-JCH |
| Plaintiff, | **ORDER** |
| v. | |
| United States Environmental Protection Administration, et al., | |
| Defendants. | |

In this case, Plaintiff Center for Biological Diversity (the "Center") asserts the Endangered Species Act ("ESA") requires Defendant Environmental Protection Agency ("EPA") to consult with expert agencies before issuing recommended water-quality criteria. *E.g.*, Doc. 29 at 16–17.[1] EPA responds that the ESA only requires EPA to consult later, when states apply to adopt or modify EPA's recommended criteria. *E.g.*, Doc. 31 at 12–13. The issues are fully briefed, *see* Docs. 32, 37, and the Court heard oral argument on July 18, 2023. Doc. 38 ("Hr'g Tr.").

Although EPA's position is defensible, the Court agrees with the Center that issuing water-quality criteria recommendations is an "action" under the ESA that requires consultation. The Court therefore will grant in part summary judgment for the Center, deny summary judgment for EPA, vacate EPA's 2016 chronic freshwater 304(a) cadmium criterion, and remand EPA's 2016 304(a) cadmium criteria for proceedings consistent with this Order.

---

[1] All page citations are to the ECF document page number unless otherwise specified.

## I.    Background

This case arises from the intersection of the ESA and the Clean Water Act ("CWA"). The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). Its heart is section 7(a)(2). *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495 (9th Cir. 2011). Section 7(a)(2) provides:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species....

16 U.S.C. § 1536(a)(2). The Department of the Interior, through the United States Fish and Wildlife Service ("FWS"), and the Department of Commerce, through the National Marine Fisheries Service ("NMFS" and together with FWS "the Services"), promulgated regulations interpreting and implementing ESA Section 7(a)–(d). 51 Fed. Reg. 19926-01; 50 C.F.R. § 402.01. These regulations provide:

> Each Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat. If such a determination is made, formal consultation is required....

50 C.F.R. § 402.14(a). By contrast, if an agency determines its action will have "no effect," then consultation is not required. *See San Luisa & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 596 (9th Cir. 2014) (citing 50 C.F.R. § 402.14).

The CWA exists to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" by reducing, and eventually eliminating, the discharge of pollutants into these waters. 33 U.S.C. § 1251(a). To that end, the CWA requires each state to adopt water quality standards for all the waters of that state and to review them at least every three years. *Id.* §§ 1313(a), (b), (c)(1) (2000). EPA administers the CWA. 33 U.S.C. § 1251(d). As the CWA's administrator, EPA must develop and publish recommendations for states' water quality criteria, called "304(a) criteria." *Id.* §§ 1313(a)–(d), 1314(a). As of 2015, states must either adopt EPA's 304(a) criteria or explain their decision not to,

justifying any departure based on "sound scientific rationale" and "scientifically defensible methods." *See* 40 C.F.R. §§ 131.11, 131.20(a). Specifically,

> States must adopt those water quality criteria that protect the designated use. Such criteria must be based on sound scientific rationale and must contain sufficient parameters or constituents to protect the designated use. For waters with multiple use designations, the criteria shall support the most sensitive use.
>
> ….
>
> In establishing criteria, States should:
>
> (1) Establish numerical values based on:
>
> > (i) 304(a) Guidance; or
> >
> > (ii) 304(a) Guidance modified to reflect site-specific conditions; or
> >
> > (iii) Other scientifically defensible methods;
>
> (2) Establish narrative criteria or criteria based upon biomonitoring methods where numerical criteria cannot be established or to supplement numerical criteria.

40 C.F.R. § 131.11. Likewise,

> [I]f a State does not adopt new or revised criteria for parameters for which EPA has published new or updated CWA section 304(a) criteria recommendations, then the State shall provide an explanation when it submits the results of its triennial review to the Regional Administrator consistent with CWA section 303(c)(1) and the requirements of paragraph (c) of this section.

40 C.F.R. § 131.20. Whatever course states choose to take, they must seek EPA's permission before revising their water-quality standards. 33 U.S.C. § 1313(c). If a state fails to maintain CWA standards, EPA is also required to promulgate water quality standards for that state directly. 33 U.S.C § 1313(c)(4).

The Center and EPA agree on the material facts. *Compare* Doc. 29 at 11–17, *with* Doc. 31 at 10–15. In 2001, EPA and the Services signed a Memorandum of Agreement (MOA) "to enhance coordination between [the] agencies so [they could] best carry out [their] responsibilities under the CWA and ESA." 66 Fed. Reg. 11202; AR 4768–83. For its part, EPA agreed it would consult with the Services at the national level. AR 4778. The MOA stated:

///

> National 304(a) consultations will ensure a consistent approach to evaluating the effects of pollutants on species …. National consultations will also ensure better consideration of effects on species whose ranges cross State boundaries.

66 Fed. Reg. 11202, 11212; AR 4778. In 2007, EPA began its first national consultation under the MOA for cyanide. AR 4790. In 2010, the Services issued draft Biological Opinions finding that EPA's proposed cyanide criteria likely would jeopardize more than 200 species. *See* AR 5089–901; AR 5392.  FWS noted:

> [T]his biological opinion does not include incidental take exemptions [(permitting incidental harms to protected species in certain circumstances)] …. Therefore, it will be necessary for EPA to conduct subsequent, step-down ESA section 7 consultations … on individual State and Tribal water quality standards …. [FWS] anticipate[s] much of the [nationwide] analysis will carry over, so that the [state-level] consultation … need only focus on potential effects of elements that were not fully considered here.

AR 4788; *accord* AR 5395 (NMFS's draft biological opinion). The parties disagree to some extent what happened next. EPA cites its own letter to the Services to assert EPA and the Services agreed to end the cyanide national consultation for a variety of reasons. *See* AR 4766–67. The Center asserts "[t]here are no contemporaneous documents in the record … confirming this decision was made." Doc. 29 at 15–16 (citing Docs. 21-2, 26-2, 28-2). In any event, the parties agree nothing further came of the 2001 MOA after the Services' issued their draft biological opinions.

In 2016, EPA revised its 304(a) criteria for cadmium. *See* Doc. 29 at 12; Doc. 31 at 10. Cadmium is a metal pollutant that can harm aquatic species, particularly in freshwater species and long-lived species. *See* Doc. 29 at 11; Doc. 31 at 10. Harmful exposure to cadmium may be either acute or chronic. *See* Doc. 29 at 11; Doc. 31 at 11. Acute exposure causes increased mortality in organisms, and chronic exposure affects their growth, reproduction, immune and endocrine systems, development, and behavior. AR 725. Cadmium pollution in water predominantly results from human sources, such as mining or industrial waste. *See* Doc. 29 at 11; Doc. 31 at 10. The Services have noted that increased cadmium levels would risk harm to many listed species, including salmon, steelhead,

sturgeon, sea turtles, corals, and mussels. *See* AR 1628–29, 1656, 5463. Of the four categories of allowable cadmium concentration—acute and chronic for freshwater, and acute and chronic for marine/estuarine waters—EPA increased only the chronic freshwater criterion; EPA decreased the criteria for the other three categories. *See* Doc. 29 at 13; Doc. 31 at 11. Before revising the criteria, EPA followed its own process for major criteria revisions, which included data review, public notice, a call for additional data, peer review, public input, and publication of the final criteria in the Federal Register. *See* 63 Fed. Reg. 67548, 67549; AR 722–883.

EPA did not consult with NMFS and FWS when it revised and published the new cadmium criteria. *See* Doc. 29 at 12–13; Doc. 31 at 16. Instead, EPA performed state-level consultations for each state that has revised its cadmium criteria since the 2016 revision. *See* Doc. 31 at 13; Hr'g Tr. at 65:19–25. EPA justified its state-by-state approach in a response to the Center's public comment on its 2016 criteria. *See* AR 871. EPA noted that national consultations are inefficient because "any gains in consistency from an initial national consultation are likely to be undone by inconsistencies among the follow-up consultations at the field office level." AR 871. EPA also noted that even if it conducted nationwide consultations, they would not "obviate the need for further consultation" at the lower level. AR 871. EPA also acknowledged that nationwide consultation would "tend to produce" more stringent 304(a) criteria. *See* AR 871; *see also* Doc. 31 at 12.

## II.   Legal Standards

### A.  Summary Judgment Standard

Summary judgment is required if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is a particularly appropriate tool for resolving claims challenging agency action. *See Occidental Eng'g Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985).

///

**B. Review Standard**

The Court reviews de novo an agency's interpretation of a statute outside its administration. *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc) (citations omitted). The Court may set aside an agency's action if the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

**III.   Analysis**

**A. Standing**

The parties first dispute whether the Center has standing to bring its case. Article III standing requires "(1) a concrete and particularized injury that is 'actual or imminent, not conjectural or hypothetical'; (2) a causal connection between the injury and the defendant's challenged conduct; and (3) a likelihood that a favorable decision will redress that injury." *Pyramid Lake Paiute Tribe of Indians v. Nev. Dep't of Wildlife*, 724 F.3d 1181, 1187 (9th Cir. 2013) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130 (1992)). When a plaintiff is an organization, plaintiff's members must set forth their "reasonable concerns about the effects of [the challenged activity]" and how that activity "directly affected those [members'] recreational, aesthetic, and economic interests." *Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 183-84 (2000). "[T]he desire to use or observe an animal species, even for purely [a]esthetic purposes, is undeniably a cognizable interest for purposes of standing." *Lujan*, 504 U.S. at 562–63.

**a.   The Center establishes injury-in-fact.**

Injury-in-fact from a procedural injury is established by showing "the procedures in question are designed to protect some threatened concrete interest … that is the ultimate basis of [a plaintiff's] standing.' *Nat. Res. Def. Council v. U.S. Env't Prot. Agency*, 38 F.4th 34, 54 (9th Cir. 2022) ("NRDC (2022)") (citing *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1225 (9th Cir. 2008)). EPA somewhat ambivalently disputes that the Center has established injury-in-fact. Doc. 31 at 16 (challenging "at least" the second and third prongs); *see also* Doc. 37 at 9–10 (emphasizing aspects of EPA's MSJ

challenging imminent injury). Either way, the Court must resolve the question to its satisfaction. *See Lance v. Coffman*, 549 U.S. 437, 439 (2007) ("A federal court has an obligation to assure itself of jurisdiction before proceeding to the merits[.]").

First, the Center alleges a procedural injury because it claims EPA violated the ESA when EPA issued revised 304(a) criteria without consulting the Services. Doc. 29 at 18. Failure to conduct a required consultation is a procedural injury for standing purposes. *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 969 (9th Cir. 2003). Second, the Center's members assert that cadmium threatens their educational, professional, and recreational activities associated with protected species. Doc. 29 at 18; *see also, e.g.*, Doc. 29-1 (declarant Burdette describing personal and professional interests extending to South Atlantic and Gulf Regions (more than 20 states), Kemp's ridley sea turtles that range between Nova Scotia, North Carolina, Texas, and Mexico, and Atlantic sturgeon that range between New York, North Carolina, and Georgia). Mr. Burdette's interests, like the other declarants, indicate a "tangible, continuing connection" to states and species impacted by EPA's decision not to conduct nationwide consultation. *See Ecological Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1148 (9th Cir. 2000). Third, the ESA consultation requirement was designed to "advance the ESA's overall goal" of protecting endangered species, *see Salmon Spawning & Recovery All.*, 545 F.3d at 1225–26, including the Kemp's ridley sea turtles and Atlantic sturgeon the Center's members have a concrete interest in. Finally, the Center's members adequately allege their interest is threatened by EPA's state-by-state approach to water-quality consultation, which the Center says insufficiently provides for cumulative and inter-state effects compared with nationwide consultation. Doc. 29 at 18. More generally, and as discussed in more detail below, *see* §§ III(A)(b), (B), the Court finds that the Center's alleged injury is actual and imminent because EPA's current approach is deficient in ways that tend to produce less stringent criteria and have been adopted or likely will be adopted by most states soon.

### b.  The Center establishes causation.

Given an alleged procedural injury, "[t]he causation requirement is satisfied by

showing a 'reasonable probability of the challenged action's threat to [plaintiffs'] concrete interest.'" *NRDC (2022)*, 38 F.4th at 54–55 (citing *Nat'l Fam. Farm Coal. v. EPA*, 966 F.3d 893, 910 (9th Cir. 2020)). The challenged action here is EPA's decision not to conduct nationwide consultation. The Center alleges EPA's decision threatens the Center's interests by inadequately considering cumulative and inter-state effects. This threat either has materialized or will materialize imminently. For example, Mr. Burdette describes his ongoing interest and plans to observe Kemp's ridley sea turtles and Atlantic sturgeon, which are found near his home in North Carolina but range far outside state waters. Doc 29-1 ¶ 22. North Carolina has adopted EPA's 2016 criteria. AR 4641–87. Similarly, declarant Miller describes an ongoing interest in and plans to observe chinook salmon and green sturgeon, which are found near his home in Oregon but range between Washington and California. Doc 29-4 ¶¶ 7, 13. Oregon and California currently use the EPA's 2001 304(a) criterion for chronic freshwater cadmium and are overdue to review and update it. *See* Doc. 29 at 37, 40; 40 C.F.R. § 131.20(a). Washington currently uses EPA's 1985 304(a) criteria together with EPA's National Toxics Rule and is overdue to review and update them. *See* Doc. 29 at 21; 40 C.F.R. §§ 131.20(a), 131.36. If, as the Center alleges, EPA's current state-by-state approach to Section 7 consultation is inadequate, Mr. Burdette and Mr. Miller's interests, like the other declarants, are threatened to a reasonable probability. In that case, the threat materialized for Mr. Burdette and the other declarants whose states adopted EPA's 2016 criteria. And the threat currently hangs over Mr. Miller and those declarants whose states are overdue to review and revise their water quality standards.[2] The Court thus turns to the question of whether EPA's current approach creates a reasonable probability of harm and thereby threatens the Center's concrete interests.

First, EPA's current approach creates a reasonable probability of harm because it likely results in less stringent criteria than nationwide consultation would produce. EPA

---

[2] The Court assumes states will comply with the law. Here, that means the Court assumes states overdue to review and revise their water-quality standards will do so immediately. The alternative—permitting hypothetical failure to comply with the law to defeat standing—would set the standing threshold impossibly high.

acknowledges that nationwide consultation likely would "tend to produce" more stringent criteria. Doc. 31 at 12; AR 871 (response to the Center's public comment on EPA's 2016 criteria).[3] That result is intuitive because EPA's criteria would then have to account for those states with the highest risk and exposure to cadmium. EPA argues that more stringent criteria are inefficient because more states would have to depart from them, causing greater expense overall. *See* Doc. 31 at 36 (defining the purpose of 304(a) criteria as to alleviate states' "burden"). But the ESA instructs agencies to give endangered species "first priority," "whatever the cost." *Tenn. Valley Auth.*, 437 U.S. at 184–85, 194. Agencies must review their actions "at the earliest possible time," 50 C.F.R. § 402.14, "to avoid piecemeal chipping away of habitat … [that] eviscerate[s] Congress' intent to give the benefit of the doubt to [threatened] species." *See Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988) (citation omitted). EPA's argument essentially turns that mandate on its head. *See* Doc. 31 at 12 ("allowing the most sensitive location-specific potential concerns" for protected species "to drive national recommendations would inappropriately distort those recommendations."); AR 871 ("EPA believes that it is more efficient [for states to modify 304(a) criteria to make them more stringent than to modify 304(a) criteria to make them less stringent]."). The ESA requires primary consideration of protected species, not efficiency or cost-effectiveness. EPA's contrary emphasis drives the point home. EPA emphasizes again and again that nationwide consultation would be cumbersome and that more states would have to seek site-specific variances. But that is the point. Nationwide consultation would produce more stringent criteria, which gives the "benefit of the doubt" to protected species. The Center and its members seek a result consistent with the ESA's policy. To the extent that result is inconsistent with EPA's policy, EPA's policy must yield.

Second, EPA's approach creates a reasonable probability of harm because NMFS

---

[3] In its Reply, EPA tries to distance itself from this admission. *See* Doc. 37 at 11. EPA emphasizes that nationwide consultation would "'tend to produce' recommended criteria 'that states would need to modify to make less stringent,'" not that more stringent criteria "would in fact occur." *Id.* That distinction is irrelevant because a tendency to produce something is also a reasonable probability that it will occur.

believes EPA's approach is inadequate. NMFS is one of the two agencies entrusted with promulgating and administering ESA's enacting regulations. NMFS is also a subject-matter expert, responsible for understanding and quantifying risks to protected species. NMFS's interpretations of ESA's enacting regulations are therefore highly relevant. In 2016, NMFS commented on EPA's 2016 304(a) criteria when EPA sought public comment. *See* AR 1628–29. NMFS asserted EPA's decision to consult "only when [EPA] approves state proposed water quality criteria results in a piecemeal approach when considering implications of such guidelines for broadly ranging species." AR 1629. NMFS urged EPA to "implement an assessment strategy that takes into account the aggregate effects of EPA's authorizations of state proposed water quality criteria such that EPA can ensure that these authorizations taken together do not jeopardize the continued existence of ESA listed species[.]" AR 1629. NMFS specifically identified concerns with sturgeon and sea turtles. *See* AR 1628. For sea turtles, NMFS wrote:

> The Oregon consultation concluded that ESA listed sea turtles would be unlikely to accumulate a significant amount of cadmium specifically from state waters. However, EPAs cadmium guidelines apply to all waters of the US so exposures would occur throughout the US portion of sea turtle ranges. Further cadmium accumulates in tissue with age and sea turtles are understood to be very long lived species. For example, green turtles reach sexual maturity between 20 and 50 years of age. For such long lived species we would need to consider whether cadmium accumulation from US waters over a lifespan would reach tissue concentrations directly resulting in or contributing to adverse effects.

AR 1628. NMFS's concerns mirror the Center's and its declarants'. *See* Doc. 29 at 29; Doc. 29-4 ¶ 23. NMFS uniquely understands the strengths and weaknesses of its consultations with EPA. If, as the record shows, NMFS believes its state-by-state consultations with EPA inadequately consider cumulative and inter-state effects, then they likely do. At the very least, NMFS's concerns create a reasonable probability of harm from EPA's decision not to conduct nationwide consultation.

Third, EPA's approach creates a reasonable probability of harm because the record shows that formal consultations do not completely consider cumulative and inter-state effects. North Carolina, for example, sought to adopt EPA's 2016 criteria, and EPA

accordingly consulted formally with NMFS. *See* AR 11699–995. NMFS's biological opinion focused almost entirely on North Carolina, not species' lifecycle or migratory path. *See id.* EPA insists that biological opinions consider cumulative and inter-state effects through the definition of the "environmental baseline" and "action area." Doc. 31 at 34–35. EPA's argument is not supported by the record. Cumulative effects are limited to those within "the action area." AR 11804; 50 C.F.R. § 402.02 (same). Similarly, the "environmental baseline" is "the condition of the listed species or its designated critical habitat *in the action area*, without the consequences to the listed species or designated critical habitat caused by the proposed action." AR 11751 (emphasis added); 50 C.F.R. § 402.02 (same). The "action area" includes "all waters the criteria will be applied to within the state … and any waters in other states affected by [that state's] water quality[.]" AR 11733; 50 C.F.R. § 402.02. Essentially, a biological opinion considers 304(a) criteria impacts to species within the state and within waters downstream of the state. It does not, as EPA contends, thereby focus on the lifecycle of long-lived and migratory species who range both upstream and downstream of a state. EPA's citation to the Services' 2019 revision of Section 7 regulations is misplaced. *See* Doc. 31 at 34-35 (citing 84 Fed. Reg. 44,976, 44,994-95 (Aug. 27, 2019)). The Services' discussion of the "effects of climate change both 'within and outside the action area'" does not suggest the Services analyze species' life history outside the action area. Climate change appears to be a unique aspect of biological opinions. *See, e.g.*, AR 11804–05 (setting apart climate change in a subsection of cumulative effects within the action area). The other state consultations show similar shortcomings. The record of formal state-by-state consultations thus shows that EPA's approach creates a reasonable probability of harm by failing to consider cumulative and interstate effects completely.

Finally, EPA's approach creates a reasonable probability of harm even if formal consultations are not deficient because EPA can conduct informal consultations. Informal consultations do not require a biological opinion from the Services. *See* 50 C.F.R. § 402.13. Instead, EPA typically produces a biological assessment or evaluation, which avoids a

formal consultation if the Services concur with its conclusions. *See* 50 C.F.R. §§ 402.13, 402.14(b)(1). Most of EPA's consultations are informal. Hr'g Tr. at 66:2–5. EPA concedes that these informal consultations do not use the "environmental baseline" term, but insists they still consider cumulative effects. Doc. 31 at 35 (citing, *e.g.*, AR 3289–90 (Mississippi), 3667 (Northern Mariana Islands)). EPA's citations do not support its claim. The Mississippi Biological Evaluation, for example, mentions bioaccumulation but does not consider inter-state effects. AR 3289–90. Similarly, the Northern Mariana Islands consultation mentions "bioaccumulation" but only in contrast with "direct effects." AR 3667. The other informal consultations have similar shortcomings. Thus, even if formal consultations sufficiently considered cumulative and interstate effects, EPA's state-by-state approach would still create a reasonable probability of harm through its use of informal consultations.

### c.  The Center establishes redressability.

Given a procedural violation, the redressability prong is satisfied by showing that the agency decision "could be influenced" by the procedures at issue. *NRDC (2022)*, 38 F.4th at 56 (citing *Hall v. Norton*, 266 F.3d 969, 977 (9th Cir. 2001)). Here, nationwide consultation on cadmium 304(a) criteria would require EPA to collaborate with an expert agency, and 304(a) criteria "could be influenced" as a result. *See id.*; 50 C.F.R. §§ 402.13–402.14. That is the purpose of consultation. EPA also acknowledges that "nationwide consultation for Section 304(a) criteria would tend to produce more stringent recommendations." Doc. 31 at 12. Therefore, EPA's approach to consultation could influence EPA's determination of 304(a) criteria.

### d.  EPA's objections are unpersuasive.

EPA objects that the Center lacks standing because any harm flows from multiple subsequent regulatory steps, specifically a state-level process, expert agency consultation, and EPA review and approval. Doc. 31 at 17. EPA focuses on declarant Miller as an example, asserting that Mr. Miller "provides no evidence that [California, Oregon, and Washington] will adopt EPA's 2016 recommended 304(a) criteria for cadmium without modification[.]" Doc. 31 at 18. EPA's point is two-fold: any injury flows from subsequent

1   regulatory steps, not the 304(a) criteria, and, for the same reason, nationwide consultation

2   cannot redress that injury. *See id.* at 17 (citing *Nat. Res. Def. Council, Inc. v. EPA*, 16 F.3d

3   1395, 1408 (4th Cir. 1993) ("NRDC (1993)"); *Arizona Yage Assembly v. Garland*, 595 F.

4   Supp. 3d 869, 880 (D. Ariz. 2022)).

5       EPA's argument and cases are unpersuasive for several reasons. First, the injury the

6   Center asserts is not too tenuously connected to EPA's failure to consult because states are

7   required to explain any departure from EPA's criteria and because most states adopt EPA's

8   criteria verbatim. *See also supra* § III(B). Just as 304(a) criteria affect state water-quality

9   standards generally, EPA's procedures generating 304(a) criteria—including nationwide or

10  state-by-state consultation—affect state water-quality standards. That is enough for

11  procedural causation. For redressability, the bar is even lower—the *possibility* of influence

12  is enough. *See NRDC (2022)*, 38 F.4th at 56. As discussed throughout this Order, the Center

13  has shown more than a possibility. Second, *NRDC (1993)* is not helpful to EPA because its

14  reasoning was based in part on the lack of "compulsory language" accompanying 304(a)

15  criteria, and it was decided before EPA began requiring states to explain any departure

16  from EPA's criteria. *See* 16 F.3d at 1407–08.[4] Similarly, in *Arizona Yage Assembly*,

17  plaintiffs lacked standing because the interim guidance at issue "does not require Plaintiffs

18  to do anything or prevent them from doing anything[.]" 595 F. Supp. 3d at 880. That is not

19  the case here, where states must justify any departure from EPA's 304(a) criteria. The

20  Center and its declarants are hardly imagining things when they observe an identity

21  between EPA's 304(a) criteria and most states' water-quality standards. EPA's regulations

22  may "only" require states to justify any departure, but that requirement appears to have a

23  powerful effect on what they actually do. That is enough to remove the Center's concerns

24  from the realm of attenuated connections and speculation. But even if that were not enough,

25  the fact that at least 25 states, tribes, and territories have adopted EPA's 2016 criteria means

26  any shortcomings stemming from a failure to consult nationwide have actually

27

28  _____

[4] *NRDC (1993)* was also decided based on whether issuing 304(a) criteria is a "final action" under the APA, not standing in an ESA context. *Id.*

- 13 -

1    materialized.

2         For these reasons, the Court finds that the Center has standing to challenge EPA's

3    decision to revise its 304(a) criteria without conducting nationwide consultation.

4    **B.  Issuing 304(a) criteria is an "action" under the ESA.**

5         Section 7 of the ESA defines agency action as "any action authorized, funded, or

6    carried out by [a federal] agency." 16 U.S.C. § 1536(a)(2). The ESA implementing

7    regulations provide:

8         Action means all activities or programs of any kind authorized, funded, or
          carried out, in whole or in part, by Federal agencies in the United States or
9         upon the high seas. Examples include, but are not limited to: (a) actions
          intended to conserve listed species or their habitat; (b) the promulgation of
10        regulations; (c) the granting of licenses, contracts, leases, easements, rights-
          of-way, permits, or grants-in-aid; or (d) actions directly or indirectly causing
11        modifications to the land, water, or air.

12
13   50 C.F.R. § 402.02. Section 7 and its requirements "apply to all actions in which there is

14   discretionary Federal involvement or control." 50 C.F.R. § 402.03.

15        The ESA's appearance of broad meaning is not deceiving. Agencies must give

16   endangered species "first priority," even over the agencies' primary missions, "whatever

17   the cost." *Tenn. Valley Auth.*, 437 U.S. at 184–85, 194. To that end, "'agency action is to

18   be 'construed broadly.'" *Karuk Tribe*, 681 F.3d at 1021 (citation omitted). Unsurprisingly,

19   this broad construction leads courts to find that many agency activities are "actions." *See,*

20   *e.g.*, *Karuk Tribe*, 681 F.3d at 1021 (collecting cases). Some examples are straightforward.

21   *See, e.g.*, *Washington Toxics Coal. v. Env't Prot. Agency*, 413 F.3d 1024 (9th Cir. 2005)

22   (registering a pesticide is an action); *NRDC (1993)*, 16 F.3d at 1395 (approving states'

23   water-quality standards is an action); *N. Plains Res. Council v. U.S. Army Corps of*

24   *Engineers*, 454 F. Supp. 3d 985 (D. Mont. 2020) (permitting certain activities nationwide

25   is an action); *see also W. Watersheds Project v. Matejko*, 468 F.3d 1099, 1108 (9th Cir.

26   2006) ("'inaction' is not 'action'"). Other examples of agency action are more subtle. *See,*

27   *e.g.*, *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850 (9th Cir.

28   2022) (issuing guidelines for oil treatment is an action), *cert. denied sub nom. Am.*

- 14 -

*Petroleum Inst. v. Env. Def. Ctr.*, No. 22-703, 2023 WL 3801206 (U.S. June 5, 2023); *Pac. Rivers Council v. Thomas*, 30 F.3d 1050 (9th Cir. 1994) (revising criteria for future forest management is an action); *Lane County Audubon Society v. Jamison*, 958 F.2d 290 (9th Cir. 1992) (setting criteria for selection of logging land is an action); *see also Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1073–74 (9th Cir. 1996) (informal compliance advice is not an action).

The Court analyzes whether a given activity is an "action" under the ESA in two steps: first, the Court determines "whether the agency affirmatively authorized, funded, or carried out the underlying activity"; second, the Court determines "whether the agency had discretion to influence or change the [underlying] activity for the benefit of a protected species." *See Karuk Tribe*, 681 F.3d at 1021.

### a. Issuing 304(a) criteria is affirmative because 304(a) criteria establish a condition under which states must explain themselves, "directly or indirectly causing modifications to the … water."

To start, the Court notes that agency activity itself is not the question, but rather agency activity relative to "underlying activity"—here state adoption of water-quality standards.[5] Agency activity relative to underlying activity is affirmative if it involves "decision[s] about whether, or under what conditions, to allow … [this underlying] activity to proceed." *Id.* at 1027. At oral argument, the Center emphasized one of the non-exclusive examples of agency action provided by the enacting regulations: "actions directly or indirectly causing modifications to the land, water, or air." *See* Hr'g Tr. at 83:24–84:02 (citing 50 C.F.R. § 402.02).

Here, EPA's 304(a) activity does not decide *whether* state activity may proceed. But EPA's activity does decide *how* a state may proceed: with or without explanation. If a state

---

[5] If an agency's activity "authorizing, funding, or carrying out" its own programs were sufficient to be an "agency action," then EPA's activity would be affirmative because it conducted a comprehensive data review, issued a public notice and call for additional data, developed draft criteria, issued another public notice and call for peer review and public input, and published the final criteria in the Federal Register. *See* 63 Fed. Reg. 67548, 67549; AR 722–883. The issue here is not so simple.

proposes to adopt EPA's criteria, nothing further is required of it. If a state proposes not to adopt or to depart from EPA's criteria, the state must explain or justify that departure. *See* 40 C.F.R. §§ 131.11, 131.20(a). So although EPA's 304(a) activity does not authorize states to proceed outright, it does decide a condition under which states may proceed. As discussed above, § III.A(b), and below, § III.B(b), EPA's 304(a) criteria both directly and indirectly cause modifications to the water. Those points lead the Court to agree with the Center that EPA's activity issuing 304(a) criteria is affirmative under the ESA and associated regulations.

> **b. Issuing 304(a) criteria is discretionary and influences states directly and indirectly through the CWA's adopt-or-explain requirement and in other ways.**

The second step in the Court's agency "action" analysis has two parts. First, agency actions must be discretionary. *Karuk Tribe*, 681 F.3d at 1024 (citation omitted). An agency "cannot escape its obligation to comply with the ESA merely because it is bound to comply with another statute that has consistent, complementary objectives." *Id.* (citation omitted). The competing statutory objective need only leave the agency "some discretion." *Id.* (citation omitted). Second, agency actions must influence states' activity to the benefit of protected species. *Id.* (citation omitted). Otherwise—if an agency's activity could *not* influence an activity to benefit a listed species—consultation would be a "meaningless exercise." *Karuk Tribe*, 681 F.3d at 1024 (citation omitted).

Here, and first, EPA's activity issuing 304(a) criteria demonstrates broad discretion throughout its process. To begin the process, EPA chooses when to update the criteria. *See* 33 U.S.C. § 1314(a)(1) (EPA shall revise 304(a) criteria "from time to time"). Once begun, EPA's activity issuing 304(a) criteria is also discretionary because EPA generates the criteria based on its own judgment and assumptions. *See, e.g.*, AR 5410 ("much of [EPA's 304(a) guidance] is necessarily qualitative rather than quantitative; much judgment will usually be required to derive a water quality criterion"); AR 1799 (identifying EPA's decision to discount some findings and studies over others); AR 812–22 (numerous judgments in the external peer review process). Finally, EPA's activity issuing 304(a)

criteria is discretionary because EPA may choose how to respond to peer review and public comment. AR 864, 868 (accommodating studies); AR 874 (modifying dataset).

Second, EPA's activity issuing 304(a) criteria influences states directly and indirectly through the adopt-or-explain requirement. The fact that states must explain any departure from EPA's criteria distinguishes the function of EPA's activity from a mere recommendation. A recommendation is advice on how to proceed. Take it or leave it. That is not the situation here. States do not have the luxury of "leaving" EPA's 304(a) criteria because they must in every case consider it—i.e., use it, even if only as a point of departure. *See* 40 C.F.R. §§ 131.11, 131.20(a). Not only that, but states must take additional steps if they choose not to use EPA's criteria in a particular way. *Id.* In its Reply, EPA emphasizes that a state's "explanation" could include non-scientific reasons such as budgetary constraints or that "[the state] will continue to review efforts by other states to implement EPA's … recommended [304(a)] criteria[.]" Doc. 37 at 6–7, 7; Hr'g Tr. at 59:12–61:16. EPA appears to assert that states can put off indefinitely their obligation to "adopt … water quality criteria …. based on … [1] 304(a) Guidance …; [2] 304(a) Guidance modified to reflect site-specific conditions; or [3] [o]ther scientifically defensible methods[.]" 40 C.F.R. § 131.11(a)–(b). If that were true, it would be surprising that virtually all states now use some vintage of 304(a) criteria. If states could put off their obligation indefinitely, that would also be in significant tension with the CWA's very purpose of prompting states to reduce and eventually eliminate the discharge of pollutants into the nation's waters. 33 U.S.C. § 1251(a); *see also* 56 Fed. Reg. 58420-01 (EPA's proposed 1991 criteria explaining that 304(a) criteria "are essential to the process of controlling toxics because they allow States and EPA to evaluate the adequacy of existing and potential control measures to protect aquatic ecosystems and human health"); *id.* at 58424 (EPA explaining its more forceful approach in terms of "Congressional impatience" with state progress toward adopting water quality standards).

Thus, EPA's activity issuing 304(a) criteria does more than offer a helpful recommendation. It directly impacts the states' water-quality standard process by changing

the threshold for a states' obligation to explain itself, modify 304(a) criteria, or develop an alternative, scientifically justifiable approach.[6] EPA's activity also indirectly impacts states' processes by making the alternative to adopting EPA's criteria costly. Developing unique water quality standards and justifying their departure from EPA's criteria is time-consuming and expensive. *See* AR5138–39 (NMFS comment to this effect); *cf.* 80 Fed. Reg. 51020, 51028 (EPA noting that updating 304(a) criteria recommendations requires "investing significant resources"); *see also* AR1–721 (2016 cadmium criteria document spanning over 700 pages). These direct and indirect impacts on the underlying activity of state water-quality standards distinguish EPA's activity from simple "recommendations."

Finally, EPA's activity issuing 304(a) criteria also influences states indirectly in different ways. First, EPA's 304(a) criteria become a sort of default. If a state fails to maintain standards consistent with the CWA, EPA directly promulgates water quality standards for them. *See* 33 U.S.C. § 1313(c)(4). When EPA does, it frequently uses its 304(a) criteria. *See, e.g.*, 82 Fed. Reg. 9166-01 (Oregon); 66 Fed. Reg. 9960-01 (California); 60 Fed. Reg. 22229-01 (Alaska, Arkansas, California, Idaho, Kansas, Michigan, New Jersey, Vermont, and Washington). In fact, only five states do not use EPA's 304(a) criteria. Doc. 29 at 40–41; *see generally* Doc. 31 (no dispute); Hr'g Tr. at 57:16–58:5. EPA also uses its 304(a) criteria to set contaminated property cleanup requirements, 42 U.S.C. § 9621(d)(2)(A), and to support its national effluent limit guidelines. Doc. 29 at 9; *see generally* Doc. 31 (no dispute); Doc. 37 at 8–9 (emphasizing additional steps but not fundamentally disputing); *Pronsolino v. Nastri*, 291 F.3d 1123, 1127 (9th Cir. 2002) ("[CWA water quality standards are] central to the [CWA's] carrot-and-stick approach to attaining acceptable water quality without direct federal regulation

---

[6] This is why EPA's argument about the CWA as an "independent framework" is unpersuasive. EPA urges, essentially, that the CWA is the real actor here, not EPA. *See* Doc. 31 at 24–25 ("The CWA … provide[s] an independent framework for … state water quality standards and criteria, and for using those … standards as a regulatory tool. … Section 304(a) criteria do not."). But EPA does more than plug a number into a statutory variable, then stand back and let CWA's obligations work. EPA is CWA's enforcer, and its criteria raise or lower the CWA bar at which a state must explain itself.

of nonpoint sources of pollution."). And EPA proposes to use its criteria as "[f]ederal water quality standards (WQS) for Indian reservation waters that currently do not have WQS in effect under the Clean Water Act." *See* 88 Fed. Reg. 29496, 29506 (providing five options for translating narrative water quality criteria into numeric values, including using unmodified 304(a) criteria); Doc. 37 at 8. Like the requirement that states explain any departure, the reality of how EPA's criteria are used makes them less like a recommendation and more like a plan. A plan identifies future actions an agency intends to take. EPA's 304(a) criteria similarly signal critical contours of EPA's action given a CWA violation, property cleanup, effluent permit request, and, potentially, for certain Indian reservation waters.

These distinctions bring EPA's 304(a) criteria under a line of cases considering programmatic actions. Programmatic actions—as opposed to site-specific actions—include "proposed … plan[s or] polic[ies] … providing a framework for future proposed actions." 50 C.F.R. § 402.02. Issuing programmatic documents, for example, constitutes "agency action because [programmatic documents] 'set forth criteria' that would influence future activities" without explicitly authorizing them. *Env't Def. Ctr.*, 36 F.4th at 884–85 (citing *Pac. Rivers Council*, 30 F.3d at 1055). In *Environmental Defense Center*, the court specifically noted that although issuing programmatic documents "does not directly authorize private activity," it is an action because it "establishes criteria for *future* private activity and has an 'ongoing and long-lasting effect.'" *Id.* at 884 (emphasis in original) (citation omitted). Consultation is thus required even if the criteria are not "binding." *See id.* at 885.

The court's reasoning in *Environmental Defense Center* applies squarely to EPA's 304(a) activity. EPA's activity does not directly authorize states' activity, but it does influence state activity by establishing criteria for states to consider in the future. EPA's 304(a) activity has an ongoing effect because states must consider 304(a) criteria every time they conduct their triennial water-quality standard review. EPA's activity also has a long-lasting effect because it remains in effect until EPA updates the 304(a) criteria "from

time to time"—most recently a period of 15 years. *See* AR 16. And EPA's activity has an effect because its 304(a) criteria are rarely rejected and have become the default option for most states. Finally, EPA's 304(a) activity is binding in the sense that states must consider EPA's 304(a) criteria, but EPA's activity would still require consultation even if it were not binding. Several older cases also support this result.

In *Pacific Rivers Council*, the Forest Service violated the ESA when it failed to consult with expert agencies about the effects of certain Land and Resource Management Plans ("LRMPs"). 30 F.3d at 1051. These LRMPS established "standards and guidelines to which all projects must adhere for up to 15 years[,]" as well as "measures for preventing the destruction or adverse modification of critical habitat for threatened or endangered species." *Id.* at 1052. All uses "of the forest must be consistent with the LRMP." *Id.* The court reasoned that LRMPs required consultation because "every individual project planned in both national forests involved in this case is implemented according to [them]." *Id.* at 1053. This reasoning applies to EPA's activity issuing 304(a) criteria to the extent 304(a) criteria are like plans that identify future agency action, but also because EPA's criteria come with an adopt-or-explain requirement. That requirement creates strong consistency between the EPA's 304(a) criteria and states' criteria—as evidenced by the fact that few states depart from it.

Similarly, in *Lane County Audubon Society*, the Bureau of Land Management ("BLM") violated the ESA when it failed to consult before promulgating a document self-described as "Management Guidelines." 958 F.2d at 292–94. The Guidelines established interim timber management standards, including land-use allocations, "annual allowable harvest" for each designated forest district, and detailed criteria for developing individual timber sales each year. *Id.* BLM subsequently consulted with an expert agency for individual timber sales but did not submit the Management Guidelines themselves for consultation. *Id.* at 292. On appeal, BLM argued that consultation at the programmatic level was not required because BLM consulted at the individual sale level. *Id.* at 293. The court rejected that argument, holding that BLM's activity issuing the Management

Guidelines were "without a doubt" agency action that may affect a protected species because they "set[] forth criteria for harvesting owl habitat." *Id.* at 294; *accord N. Plains Res. Council*, 454 F. Supp 3d at 992–93 (project-level consultation does not eliminate the need for programmatic-level consultation); *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 481 F. Supp. 2d 1059, 1095 (N.D. Cal. 2007) (same). Here, EPA's activity "sets forth [304(a)] criteria" for individual states to consider when updating their water-quality standards. Like a guideline that sets an annual allowable harvest, the 304(a) criteria set a maximum cadmium concentration from which any departure must be justified. And like BLM's violation of the ESA despite its consultation for individual timber sales, EPA's failure to consult when issuing its criteria violates the ESA even though EPA consults with expert agencies when individual states propose to adopt or reject EPA's criteria.

### c.  EPA's cases are distinguishable.

The adopt-or-explain requirement and direct and indirect impacts of EPA's 304(a) criteria on state water-quality standards also distinguish EPA's best cases. *See* Doc. 31 at 22–23 (citing *Matejko*, 468 F.3d at 1111, and *Marbled Murrelet*, 83 F.3d at 1073–74). In *Matejko*, the Bureau of Land Management chose not to regulate hundreds of river and stream diversions after a statutory regime change gave BLM discretion to do so given a "substantial deviation in their use or location." 468 F.3d at 1103–04, 1110. The court decided that BLM's inaction did not require consultation in part because it was not affirmative.  *Id.* at 1108 (noting the "affirmative nature of the[] words … 'authorized, funded, carried[.]'"). The court also decided BLM's inaction did not require consultation because it was not discretionary. *Id.* at 1110–11. The court noted "BLM had 'no ability to influence' a project based on a right-of-way granted before the ESA was enacted," and had "no retained power to 'inure to the benefit of the protected species.'" *Id.* (citation omitted); *see also Env't Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1082 (9th Cir. 2001) (activity not discretionary where it was "legally foreordained by an earlier decision"). As discussed above, here EPA's 304(a) criteria affirmatively decide the condition under which a state must explain itself and powerfully influence states' water-quality processes. EPA's

304(a) activity is also discretionary because the criteria are not legally foreordained, arising instead from a process EPA initiates and controls. EPA's influence over its 304(a) criteria also can inure to the benefit of protected species because EPA can issue a higher or lower allowable cadmium concentration, AR 15, and lower concentrations are more protective. *See* Doc. 31 at 12 ("nationwide consultation … would tend to produce more stringent recommendations"); AR 21–23, 25 (any level of cadmium is harmful to wildlife).

EPA's other primary case is also distinguishable. In *Marbled Murrelet*, several lumber companies sought permission from the California Department of Forestry ("CDF") to harvest dead, dying, and diseased trees from an old-growth redwood stand that was potentially important to protected wildlife. 83 F.3d at 1071. In response, FWS sent joint letters with CDF describing and subsequently clarifying "specific conditions that had to be met to comply with … the ESA." *See id.* at 1071–72. FWS did not consult with expert agencies before sending the letters. *See id.* The court held that consultation was not required because FWS "merely provided advice on how the Lumber Companies could [comply with] … the ESA." *Id.* at 1074. The court also noted that requiring consultation for compliance advice "would [create] a disincentive for the agency to give such advice[,]" to the detriment of protected species. *Id.* at 1074–75; *see also* Doc. 31 at 22 (emphasizing this point). Here, EPA's 304(a) criteria are more than advice on how to comply with the CWA. Advice, particularly the informal advice in *Marbled Murrelet*, does not require anything and may be ignored. By contrast, EPA's 304(a) criteria come with the requirement that states consider it and adopt it or explain their departure, and the vast majority of states adopt it, likely because the alternative is so costly. And the CWA requires EPA to update its 304(a) criteria, so EPA's willingness to do so likely will not be chilled by an additional consultation requirement.

Finally, EPA's activity issuing 304(a) criteria may "inure to the benefit of protected species" because more conservative or restrictive 304(a) criteria directly and indirectly lower the maximum allowable cadmium concentration in the nation's waters. For these reasons, EPA's activity issuing 304(a) criteria is an "action" under the ESA. EPA's decision

to issue 304(a) cadmium criteria in 2016 without consulting the Services was therefore arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

### C. 304(a) criteria "may affect" protected species.

"May affect" is a "relatively low" bar. *Karuk Tribe*, 681 F.3d at 1027 (citation omitted). "*Any possible effect*, whether beneficial, benign, adverse or of an undetermined character, triggers the [Section 7 consultation] requirement." *Id.* at 1028 (citations omitted, emphasis in the original). An agency may avoid the consultation requirement only if it determines that its action will have "no effect" on a listed species or its critical habitat. *Id.* at 1027 (citation omitted).

Here, issuing 304(a) criteria "may affect" protected species by exposing them to more or less pollution than otherwise. The whole point of 304(a) criteria is that they affect state water-quality standards. 56 Fed. Reg. 58420-01; *id.* at 58424; 40 C.F.R. § 131.20(a). If, for example, EPA nearly triples the maximum chronic freshwater criterion for a pollutant, and if that criterion is adopted verbatim by most states, then protected species in those states' waters may be exposed to more of that pollutant than if EPA had lowered the criterion, kept it constant, or increased it by a smaller amount. That chain of possibilities is not long. Its links fit snugly together—by design. EPA essentially concedes as much when it writes that nationwide consultation would "tend to produce" more stringent criteria. *See* Doc. 31 at 12; AR 871. A "tendency" is a "beneficial, benign, adverse or … undetermined" effect. *See Karuk Tribe*, 681 F.3d at 1027. The only way more stringent criteria would not in turn produce a "beneficial, benign, adverse or … undetermined" effect on protected species is if states universally chose not to adopt them. But the opposite is true. Most states adopt EPA's criteria at least in part because the alternative is costly.

EPA's arguments to the contrary are unpersuasive. EPA first argues an explicit "no effect" finding was not required. Doc. 31 at 25; Doc. 37 at 19–20. According to EPA, issuing 304(a) criteria is like "hiring more employees in an urban office setting," in the sense that both so obviously have no effect on protected species that an implicit no-effect finding is sufficient. *See* Doc. 31 at 25. The Court disagrees. Issuing 304(a) criteria is not

- 23 -

like hiring employees because one is designed to influence state water-quality standards and the other is not. EPA revised its cadmium guidance without finding that its actions would have no effect on a listed species or endangered habitat as required by the ESA. *See* Hr'g Tr. at 70:25; 72:18–21. But the ESA requires all federal agencies to "review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat." 50 C.F.R. § 402.14(a). The issue, then, is not simply that EPA's finding was unreasonable, but that it did not make one in the first place. That alone is enough to violate the ESA enacting regulations.[7]

EPA next argues that its implicit no-effect finding was reasonable primarily because nationwide consultation is expensive and time-consuming. *See* Doc. 31 at 25–28. But EPA's policy and past effort to conduct nationwide consultations are largely irrelevant. *See* Doc. 31 at 28–30. EPA asserts that its implicit no-effect finding was reasonable because the process took several years and would still require state-level consultation. *Id.* EPA overlooks some important details. As discussed above, EPA's view of proper or efficient policy must yield to the ESA's policy—whatever the cost. *See supra* § III(A)(b). Furthermore, the record does not support EPA's position. EPA's main observation is that state-level consultations were still anticipated despite EPA's nationwide consultation with the Services. Doc. 31 at 29–30 (citing draft nationwide biological opinions by FWS (AR 4788) and NMFS (AR 5395)). But FWS wrote that "much of the [nationwide] analysis would carry over, so that the [state-level] consultation … need only focus on potential effects of elements that were not fully considered here." AR 4788; *accord* AR 5395 (NMFS cabining state-level consultations in context of incidental take permits not related to the main pollutant at issue); *see also* Hr'g Tr. at 90:1–16 (making the point that nationwide consultations likely would become more efficient over time through practice). Really, though, the bottom line here is that EPA does not have discretion to avoid its obligations under the ESA because EPA thinks they are inconvenient. And EPA's assertion that its

---

[7] In its Reply, EPA appears to argue that EPA can avoid any obligation to consult simply by choosing not to make an effects determination (or making an implicit no-effect finding). Doc. 37 at 19:16–23. That would be surprising.

non-existent no-effect finding was reasonable flies in the face of EPA's own recognition that nationwide consultation would tend to produce more stringent criteria.[8]

For those reasons, the Court finds that EPA's 304(a) criteria may affect protected species, such that consultation with expert agencies was required before revising the cadmium criteria in 2016.

**D. Relief**

The Center asks the Court to vacate EPA's 2016 freshwater chronic cadmium criterion, remand all four 2016 criteria back to EPA, and to order EPA to initiate consultation on all four criteria during remand. Doc. 29 at 38.

**a. Vacatur**

In the Center's view, only partial vacatur is desirable because EPA lowered the maximum allowable concentration for three of four cadmium criteria. Doc. 29 at 38. Vacating those three could thus have a counter-productive effect. *Id.* EPA does not respond to the Center's vacatur argument. *See* Doc. 31 at 37.

Vacatur is presumptive and normally accompanies a remand when the Court finds an unlawful agency action produces an invalid result. *Alliance for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018) (citations and internal quotations omitted); *Ctr. for Biological Diversity v. Haaland*, 2022 U.S. Dist. LEXIS 94822, *8–9 ("Because vacatur is the presumptive remedy, the [agency] bears the burden of demonstrating vacatur is inappropriate.") (citation and internal quotation marks omitted). Remand without vacatur should be ordered "only in limited circumstances," with invalid rules left in place "only when equity demands." *Pollinator Stewardship Council v. U.S. E.P.A.*, 806 F.3d 520, 532 (9th Cir. 2015) (citations and internal quotations omitted). The Court considers three factors to determine whether vacatur is appropriate: (1) the

---

[8] EPA also argues that its implicit no-effect finding was reasonable because no effects were "reasonably likely to occur." Doc. 37 at 18–20 (drawing on regulatory definition of "effect"). This argument is unpersuasive for the same reasons discussed throughout this Order, namely that both practically (through cost considerations), legally (through the adopt-or-explain requirement), and by design, effects are nearly certain to occur.

1    seriousness of the agency's error weighed against the disruption that vacatur would cause;

2    (2) the risk to environmental harm of either vacating or leaving the decision in place; and

3    (3) likelihood of the agency's ability adopt the same rule on remand. *NRDC (2022)*, 38

4    F.4th at 51–52.

5            Here, all three factors weigh in favor of partial vacatur. First, EPA's violation was

6    serious because it ignored an ESA requirement that likely would produce more stringent

7    criteria. *See* Doc. 31 at 10; AR 871. Vacating the 2016 freshwater chronic criterion likely

8    would cause no disruption because states subsequently revising their water-quality

9    standards would simply use EPA's 2001 criterion. And states that already adopted EPA's

10   2016 criteria could continue to rely on EPA's approval until their next triennial review.

11   Second, and similarly, the risk to environmental harm of leaving the freshwater chronic

12   criterion in place is high given the shortcomings of EPA's state-by-state consultation as

13   discussed above. This factor also weighs in favor of partial vacatur, because vacating the

14   three more stringent criteria would risk environmental harm for the same reasons leaving

15   the fourth criterion in place would risk environmental harm. Third, EPA is unlikely to adopt

16   the same rule on remand because nationwide consultation likely will produce more

17   stringent criteria. *See* Doc. 31 at 12; AR 871. And the Court has found EPA's 304(a) criteria

18   "may affect" protected species as a matter of law. Thus, the balance of these factors weighs

19   in favor of partial vacatur.

20           EPA fails to identify any equitable reasons why the Court should not vacate the

21   freshwater chronic cadmium criterion. *See* Doc. 31 at 37.[9] Considering that concession and

22   the factors above, the Court is persuaded that partial vacatur is warranted. The Court will

23   vacate EPA's 2016 chronic freshwater cadmium criterion, but not EPA's 2016 acute

24   freshwater cadmium criterion, or the 2016 chronic and acute marine cadmium criteria.

25                    **b.  Consultation on Remand**

26           The Center also urges the Court to remand all four 2016 cadmium criteria to EPA

27   ─────────────────────────

28   [9] In its Reply, EPA still does not identify equitable considerations, but requests further
     briefing on remedy if the Court finds for the Center. Doc. 37 at 22. Given the Court's
     disposition below, further briefing is unnecessary.

1   and order it to initiate consultation during remand. Doc. 29 at 38. EPA responds that the

2   Court should instead limit the Center's remedy "to a remand for EPA to reconsider its no-

3   effect determination and make new ESA effects determination for those criteria." Doc. 31

4   at 37 (citing without argument *Ctr. For Biological Diversity v. Leavitt*, No. C 02-

5   01580JSW, 2005 WL 2277030, at *3 (N.D. Cal. Sept. 19, 2005); *Ctr. for Biological*

6   *Diversity v. EPA*, 861 F.3d 174, 189 n.13 (D.C. Cir. 2017); *Pac. Rivers Council v.*

7   *Robertson*, 854 F. Supp. 713, 723 n. 14 (D. Or. 1993), *rev'd as to injunctive relief by Pac.*

8   *Rivers Council*, 30 F.3d at 1057).

9       EPA's implied argument is unpersuasive because the cases it cites are

10  distinguishable. None of them involve a situation where, as here, the agency concedes that

11  consultation likely would produce more stringent criteria. *See* Doc. 31 at 12; AR 871. This

12  case is more similar to *Karuk Tribe*, where the court determined "almost … as a textual

13  matter" that the agency action "may affect" critical habitat. *Karuk Tribe*, 681 F.3d at 1027.

14  The issue there was mining activity that, by definition, might disturb fish habitat. *Id.* The

15  issue here is 304(a) activity that, by design, influences state water-quality standards.

16      Nevertheless, the Court prefers not to manage an intricate and ongoing process. EPA

17  has acted in good faith, and the Court has no reason to believe it will not respond to partial

18  vacatur and remand appropriately. Ordering consultation is therefore unnecessary.

19  **IV.     Order**

20      For these reasons,

21      **IT IS ORDERED GRANTING IN PART** the Center for Biological Diversity's

22  Motion for Summary Judgment (Doc. 29) consistent with this Order.

23      **IT IS FURTHER ORDERED DENYING** the United States Environmental

24  Protection Agency's Motion for Summary Judgment (Doc. 31).

25      **IT IS FURTHER ORDERED VACATING** EPA's 2016 304(a) chronic

26  freshwater cadmium criterion.

27  ///

28  ///

- 27 -

**IT IS FURTHER ORDERED REMANDING** EPA's 2016 304(a) cadmium criteria for proceedings consistent with this Order.

The Clerk of the Court shall enter judgment accordingly.

Dated this 18th day of August, 2023.

John C. Hinderaker
United States District Judge